FILED

2013 May-17  PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ARETHA M. EDWARDS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:11-cv-01449-WMA |
| | } | |
| NATIONAL VISION, INC., | } | |
| | } | |
| Defendant. | } | |
| | } | |
| | } | |

**<u>MEMORANDUM OPINION</u>**

Before the court is a motion for summary judgment filed by defendant National Vision, Inc. ("NVI").  (Doc. 39).  The motion seeks dismissal of the above-entitled action brought by plaintiff Aretha M. Edwards ("Edwards").  Edwards, a black female, sued NVI, her former employer, for race discrimination and harassment in violation of 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), retaliation in violation of Title VII and § 1981, and violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").  She appended state law claims for negligent and wanton hiring, training, supervision, and retention; invasion of privacy; and constructive discharge.[1]

Necessary to and prefatory to the consideration of NVI's

---

[1] Edwards initially also pled a state law claim for intentional infliction of emotional distress, but voluntarily dismissed the said claim in response to NVI's motion to compel an independent medical examination. (*See* Doc. 36).

motion for summary judgment are rulings on NVI's two motions to strike certain evidentiary materials proffered by Edwards in defense of NVI's motion.  Because Edwards is entitled to rely only on **admissible** evidence and on all reasonable inferences therefrom, the court must first determine what evidence put forward by Edwards is admissible and what is not.  NVI challenges the admissibility of two pieces of would-be evidence that are crucial to Edwards's case. For the reasons discussed below, both of NVI's motions to strike will be granted.

**A.   Motion to Strike the Declaration of Victoria Alberson**[2]

NVI first moves to strike the declaration of Victoria Alberson on the ground that Edwards never disclosed the declaration to NVI prior to her filing it in opposition to NVI's motion.

On February 10, 2012, NVI served Edwards its First Request for Production of Documents.  One of these requests was:

> Produce all documents including, but not limited to tape recordings, transcripts, notes, **statements of witnesses**, or other documentation of oral conversations or communications Plaintiff has had with any current or former employee of Defendant, or any other person or entity, pertaining to the claims, allegations and defenses in this Litigation.

(emphasis added).   Edwards did not object to this request. Instead, she responded that she "ha[d] no responsive documents." At some point thereafter, but no later than September 10, 2012,

---

[2] Before Victoria Alberson got married, she was Victoria Lovelady.  The parties call her by both names.  She will be referred to here as "Alberson."

2

Edwards acquired Alberson's declaration, which is dated September 10, 2012.

On September 12, 2012, two days after the Alberson declaration was ostensibly signed, NVI took Edwards's deposition. During the said deposition NVI's counsel pointedly asked Edwards whether she had obtained any witness statements. Edwards unequivocally responded that she had neither sought nor obtained any such statements. Her counsel did not interrupt Edwards or attempt to correct her clearly erroneous and misleading testimony.

On November 13, 2012, discovery closed.[3] Thereafter, on January 3, 2013, NVI filed its motion for summary judgment without any knowledge of the existence of the Alberson declaration or of its contents. In response, Edwards filed her opposition on February 11, 2013, wherein she boldly attached the Alberson declaration without any attempt to justify its conspicuous absence from the record between September 10, 2012 and February 11, 2013. She waved a flag at the bull.

Rule 26(e), Fed. R. Civ. P., places upon litigants an obligation to supplement in a timely manner incomplete or incorrect responses to requests for production. If a party fails to discharge the said obligation, he, she, or it "is not allowed to use that information or witness to supply evidence on a motion,

---

[3] Discovery was reopened for the limited purpose of NVI's deposing Edwards's physician, Dr. Kyle.

at a hearing, or at trial, unless the failure was **substantially justified or is harmless**." Fed. R. Civ. P. 37(c) (emphasis added). As the non-disclosing party, it is Edwards's burden to establish that her failure to disclose Alberson's declaration was substantially justified or was harmless. It was neither.

Edwards admits that she failed to produce Alberson's declaration until she surprised NVI and the court with it on February 13, 2012. The court cannot permit Edwards to circumvent Rules 26(e) and 37(c) when her failure was **neither substantially justified nor harmless**.

Edwards argues that her failure to disclose the declaration was "harmless" because NVI had notice that Alberson was a potential witness. Edwards points out (1) that in her complaint she identified Alberson as one of the individuals hired for the position she wanted, (2) that in her Rule 26 disclosures she identified Alberson, and (3) that NVI's own initial disclosures listed Alberson as a possible witness. Edwards relies upon *Silverstein v. Proctor & Gamble Manufacturing Co.*, in which a Florida district court held that a party's failure to identify an expert witness is "harmless" when the opposing party had adequate notice that the witness might be called as an expert and, in fact, had already deposed the witness. 700 F. Supp. 2d 1312, 1320 (S.D. Fla. 2009). In the instant case NVI never deposed Alberson, as it might have done if it had timely been made aware of Alberson's

declaration.   Instead, discovery was routinely closed in accordance with the Rule 26 schedule, and NVI prepared its Rule 56 motion in accordance with the said schedule without any knowledge of the Alberson declaration.  Not only is *Silverstein* not binding on this court, but it is clearly distinguishable from a case that involves gross and inexcusable rule violations.

Edwards identified not just Alberson but seventeen other individuals in her initial Rule 26 disclosures.  NVI had no obligation to depose all eighteen of these persons, or, for that matter, any of them, when Edwards had affirmatively represented in her initial discovery responses, and in her subsequent deposition, that she had obtained no witness statements.  As expressed by the commentator in Moore's Federal Practice: "The duty to amend [contained in Rule 26(e)] is not limited to circumstances **in which the failure to amend constitutes a knowing concealment**."  6 *Moore's Federal Practice*, § 26.131[3] at 26-583 (Matthew Bender 3d Ed.) (emphasis added).  In Edwards's case, she was guilty of the exacerbating circumstance, i.e., "knowing concealment," referred to in Moore's Federal Practice as unnecessary to an application of Rule 37(c).  "Knowing concealment" adds fuel to the flame.  Edwards's failure to disclose Alberson's declaration two days after she had obtained it cannot be shoved under the rug as a mere inadvertence.   It was as blatant an example of "knowing concealment" as this court can imagine.

5

The fact that Edwards failed to supplement her discovery responses and, under oath, denied obtaining the Alberson declaration, if not calculated to mislead NVI, certainly succeeded in doing so. Edwards cannot escape the embrace of Rule 26(e) by belatedly asking that her clear violation be forgiven because of her sudden willingness to allow the reopening of discovery for NVI to take Alberson's deposition, a time consuming procedure that would require the filing of a new Rule 56 motion and revised brief. The striking of the Alberson declaration is the only sanction this court finds to be appropriate under the circumstances. The procedural and discovery rules were not put in place to be ignored. They are just as important to the administration of justice as is the substantive law.

**B.    Motion to Strike Edwards's Deposition Testimony and Edwards's Declaration Regarding L. Moore's Alleged Statements Upon Which Edwards Would Prove a Racial Motive by NVI Not to Promote Her**

NVI moves to strike as hearsay Edwards's testimony regarding statements that L. Moore allegedly made to her in 2008.[4] Edwards testified at deposition and in her sworn declaration that L. Moore, now deceased, who was the store manager while Edwards was employed, told her that if the Ast. Mgr. CL position was going to be filled, it would be filled with a white person, because "they" wanted a "white token." (Edwards Depo. at 260, 261-65; Decl. at

---

[4] There is a dispute, later to be discussed, as to whether L. Moore made such a comment in May 2007.

¶ 15).  This statement is being offered to prove that NVI intended to fill the Ast. Mgr. CL position with a white person and therefore intended to deny the position to Edwards because she was black.  This constitutes classic hearsay.  NVI points out that a statement by L. Moore to Edwards that a white person would be hired because "they" wanted a "white token" is double hearsay because it incorporates and depends upon what **unidentified** others, with or without any decisionmaking authority from NVI, allegedly told L. Moore.  (Edwards Depo. at 270:23-25).

The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Unless a recognized exception applies, hearsay statements are inadmissible.  Fed. R. Evid. 802.  As a general rule, hearsay statements cannot be relied upon to defeat summary judgment.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).  A district court may consider a hearsay statement in evaluating a motion for summary judgment if the statement can be reduced to admissible form at trial, but this proposition is not applicable in the instant situation, that is, unless Edwards is allowed at trial to alter substantially what she has said that L. Moore told her.  When a hearsay statement is contained within another level of hearsay, both levels must meet

some exception to the hearsay exclusion rule in order to be admissible. *See United States v. Pendas-Martinez*, 845 F.2d 938, 942-43 (11th Cir. 1998).

**Level 1:** Edwards testified that L. Moore told her in 2008 in the presence of others that if the Ast. Mgr. CL position was going to be filled, it would be filled by a white person and that **"they"** (whomever "they" consisted of) wanted a "white token." This statement, made by someone other than Edwards, and offered to prove an essential element of Edwards's Title VII and § 1981 case, is clearly hearsay. The issue, then, is whether any hearsay exception applies.

Edwards unremarkably describes L. Moore as "unavailable" because she died before April 29, 2011, the date upon which Edwards filed suit. However, L. Moore was alive when Edwards filed her EEOC charge on November 26, 2008, and was therefore "available" as a witness for some unknown period of time thereafter. What, if anything, Edwards did to obtain and to preserve L. Moore's testimony upon which she now relies is not reflected in the record. Edwards's complaint to the EEOC was under consideration by the EEOC for over three years. For aught appearing, a statement from L. Moore was a crucial piece of evidence that finally led, after three years, to the EEOC's determination. Either such a statement exists in the EEOC file and is the best evidence of what, if anything, L. Moore knew about

8

NVI's intentions vis-a-vies Edwards, or L. Moore's supposedly crucial knowledge on the subject was never sought by Edwards while L. Moore was alive, even after Edwards knew that L. Moore had been discharged by NVI and that L. Moore's death was imminent.

31A Corpus Juris Secundum, Evidence, § 405, entitled "Unavailability of Declarant as Witness," states as follows a proposition that fits this case:

> A prerequisite for admission of a declaration against interest is that the declarant be unavailable to testify at trial, and **the declarant is not considered unavailable in the absence of a showing that the party seeking to use the declaration has used reasonable diligence in an effort to secure and present the declarant's testimony.**

(emphasis added).  This court finds that Edwards did not exercise due diligence when she knew (1) the importance of L. Moore's testimony, (2) that L. Moore was at death's door, and (3) that to preserve L. Moore's testimony she could invoke Rule 27(a), Fed. R. Civ. P., the rule expressly designed for circumstances like these. The same concept is expressed as follows in Weinstein's Federal Evidence:

> The proponent must have "not been able, by process or other reasonable means" to procure the declarant's attendance.

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 804.03[6][a] at 804-16 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997) (quoting Fed. R. Evid. 804(a)(5)). Weinstein cites several cases for this proposition, including

*United States v. Curbello*, 940 F.2d 1503, 1505-07 (11th Cir. 1991), in which the Eleventh Circuit reversed a trial court for allowing hearsay from a declarant incarcerated in another country because the prosecution failed to demonstrate that it made a reasonable effort to obtain the witness's testimony by other means.

After *Curbello* and after considerable debate over the concept discussed in *Curbello,* Rule 804(a)(4) was amended to recognize as "unavailable" for purposes of a hearsay exception all declarants who are deceased, without reference to what reasonable efforts may have been made to acquire and to preserve the testimony of the now deceased witness.   Rule 804(a)(5), however, can be employed to reintroduce the *Curbello* idea, unless it is a mere alternative precluded by the prior language in Rule 804(a)(4).   A careful reading of these rules is required in order to determine their application to the instant case.

There may be a holdover from *Curbello* in the following language in Rule 804(a).

> But this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from testifying.

While there is no evidence that Edwards caused or contributed to L. Moore's untimely death, Edwards waited until after she filed this suit and until after L. Moore died to offer hearsay obtained from the mouth of L. Moore.   The above quoted language from Rule 804(a) would preclude hearsay if the proponent deliberately stalled the

10

litigation while waiting for the death of the declarant.  On this record, it is entirely possible that Edwards's wait was no more than a happy accident in her favor.

The significance of *Cynergy, LLC v. First American Title Insurance Co.*, 706 F.3d 1321 (11th Cir. 2013), was not discussed by the parties because it was not decided until after their briefs were filed.  In *Cynergy*, like in *Zaben v. Air Products & Chemicals, Inc.*, to be discussed *infra*, the appellate court was reviewing a trial court's admission of hearsay and found that there had been no abuse of discretion in allowing it.  However, in *Cynergy*, the deceased's declaration was made by affidavit under oath as distinguished from an oral unsworn statement like L. Moore's.  The trial judge in *Cynergy* admitted the hearsay under Rule 807 after making all of the findings expressly required by that rule, including that "the statement has equivalent circumstantial guarantees of trustworthiness," a finding this court cannot make under the circumstances of this case.  The affidavit in *Cynergy* was diligently procured in anticipation of the affiant's impending death, whereas Edwards made no effort to preserve L. Moore's testimony in face of her impending death.  The mere death of a witness before trial should not be a guarantee of the admissibility of hearsay from that witness in every case.

Both parties cite *Zaben v. Air Products & Chemicals, Inc.* 129 F. 3d 1453 (11th Cir. 1997).  In *Zaben*, an ADEA plaintiff relied on

11

statements allegedly made by lower-level supervisors.  The
supervisors allegedly said that "they wanted younger employees to
train them the way they wanted them."  The defendant employer
pointed out that this was hearsay.  The Eleventh Circuit affirmed
the trial court's allowance of this particular hearsay, explaining
that excepted from the definition of hearsay is "'a statement by
the party's agent or servant concerning a matter within the scope
of the agency or employment, made during the existence of the
relationship' which is deemed an admission by a party opponent."
*Zaben*, 129 F.3d at 1455 (quoting Fed. R. Evid. 801(d)(2)(D)).  L.
Moore, who allegedly made the statement that is the subject of
NVI's motion to strike, facially meets the *Zaben* exception because
L. Moore was the general manager of the Homewood location where
Edwards worked.  L. Moore can therefore be deemed to have been in
a position to make an admission against the interest of NVI, her
employer, but this is not the end of the inquiry, because L. Moore
was not relating her personal rationale for a decision being made
by her, but was merely passing along hearsay from undisclosed and
still unknown persons.

**Level 2:** Because L. Moore's statement refers to an
unidentified "they," the statement must be stricken as hearsay
and/or double hearsay.  Neither Edwards, nor NVI, nor the court has
found an Eleventh Circuit case on point.  NVI relies upon *Carden v.
Westinghouse Electric Corp.*, a Third Circuit case.  850 F.2d 996

12

(3d Cir. 1988).  **Carden is directly on point**.  There, the declarant, who, like L. Moore, was an agent of the employer, referred to what "they" wanted with respect to an employment decision.  In *Carden*, if what "they" wanted could have been attributed to the employer, it would have constituted evidence of a proscribed motive for adverse employment action.  But "they" were not identified in *Carden*.  Just as in the instant case, "they" could have been persons with no actual or ostensible authority whatsoever to speak for or to bind the employer with respect to the intent upon which the employer's liability depended.

Edwards counters with *Hybert v. Herst Corp.*, where the Seventh Circuit held that statements similar to those made by L. Moore were found admissible over a double hearsay objection.  900 F.2d 1050, 1053 (7th Cir. 1990).  The Seventh Circuit determined that the trial court there under appellate review did not abuse its discretion in an ADEA case when it admitted statements that "it's a concern of some of the guys in New York that some people in their sixties are going to be replaced" and "there is a feeling in New York that, with the arrival of a new publisher, the people we have in their sixties will be replaced." *Id.*

There is an unmistakable and wide difference between an appellate court's review of a trial court's exercise of its discretion in the admission of evidence, and a decision by a court in the first instance as to whether particular hearsay should be

allowed.  One is "after-the-fact," where the reviewing court must afford great deference to the court whose evidentiary ruling is being reviewed.  The latter is *de novo*.  This court, as the court of first instance, is not being called upon to decide whether some other court properly exercised its discretion.  It is being called upon to exercise its own judgment as to the admission of hearsay in the absence of any clear instruction from the Supreme Court or from the Eleventh Circuit as to whether what a deceased witness allegedly said to a plaintiff about what "they" said should be admitted over a hearsay objection.  Under the circumstances of this case, this court is persuaded by the logic of *Carden* and declines to admit the hearsay from L. Moore about what "**they**" may have had in mind respecting a "white token."  If L. Moore was alive and tried to testify using the exact words that Edwards now ascribes to her and no more, her sworn testimony would not be admissible because it would depend upon what unknown persons told her.  There is a crucial difference between the word "I" and the word "they." If L. Moore had said to Edwards "I plan to hire a white token," her remark could be attributed to NVI, but by her expression L. Moore was disassociating herself from the decisionmaking role and was disclaiming responsibility for what "they" had indicated.  If "they" were responsible for a racially motivated decision to hire Alberson rather than to promote Edwards, it is impossible to know who "they" consisted of.  "They" could be anybody.

14

**Sham Affidavit Dispute (Alluded to in Footnote 4, Supra)**

In her sworn declaration Edwards attests that in May **2007**, L. Moore told her the Ast. Mgr. CL position would not be filled, and that later L. Moore told her that the position was going to be filled by someone white.  (Edwards Decl. at ¶9).  NVI points out that this directly contradicts Edwards's prior sworn deposition testimony, in which she unequivocally stated that the only comments made by L. Moore regarding NVI's motivation to hire a white person were made at a **2008** staff meeting.  The last sentence of ¶9 of Edwards' declaration "flatly contradicts" her deposition testimony and, under the sham affidavit doctrine, is due to be stricken.  *See Bryant v. U.S. Steel Corp.*, No. 10-13165, 2011 WL 2150193, at *2 (11th Cir. May 31, 2011) (disregarding a "sham" affidavit because it contained statements that "flatly contradicted [plaintiff's] earlier deposition testimony).

Edwards argues that her deposition testimony does not directly conflict with her declaration, that she was simply "confused" about when these comments were made, and that the differences in her recollection only present a credibility issue.  If they present a credibility issue, it is a serious credibility issue.

While Edwards earlier may have been "confused" over the conversation  dates, she now admits that L. Moore's comments were made ***only once***, namely, before Alberson was hired in 2008. (Edwards' Depo. at 265).  This is in direct and irreconcilable

15

contradiction to ¶ 9 of her declaration in which she states that L. Moore made the same or similar comments in May 2007.  Whether this is the type of "transparent sham" that warrants striking Edwards's entire declaration, or at least ¶ 9 of it, is unnecessary to this court's opinion.  Because the hearsay statements made by L. Moore, no matter whether in 2007 or 2008, are being excluded for other reasons, the "sham affidavit" question loses its significance and will be left for another day.

### Admissible Evidence Relevant to NVI's Motion for Summary Judgment[5]

NVI is a national retail optical firm with both stand-alone stores and retail locations inside other stores.  Edwards began working for NVI in January 2007 at NVI's Homewood, Alabama store L. Moore, the general manager of the Homewood store, hired her.  Both Edwards and L. Moore are black females.[6]  L. Moore reported to Dave Nichols ("Nichols"), a black male who was the district manager responsible for the NVI stores in the Alabama market, including the Homewood location.[7]  In other words, the chain of command had two black people in the chain immediately above Edwards.

---

[5] Due to the procedural posture of the case, all **admissible** evidence and reasonable inferences therefrom will be viewed in the light most favorable to Edwards.  The court has already found **inadmissible** important evidence relied upon by Edwards.

[6] L. Moore inconveniently died before Edwards filed this action, but long after Edwards's EEOC charge was filed.

[7] During Edwards's employment, NVI operated two other stores within a seventy-five mile radius of the Homewood store.

In January 2007, the Homewood staff included a full-time optometrist and a part-time optometrist, and approximately twelve retail employees, including a general manager and two assistant managers, one responsible for eyeglasses and the other for contact lenses ("Ast. Mgr. CL").  When Edwards started, Wendi Marsh and Beryl Parker, both black females, were assistant managers at the Homewood store.  Edwards was hired as a Visual Acuity Technician ("V.A. Tech") and was primarily responsible for performing visual tests on patients prior to doctor examinations.  Edwards also consulted with patients to decide whether they were good candidates for contact lenses.  She, therefore, worked closely with the Ast. Mgr. CL.  She was, however, never a manager or supervisor.

In late spring 2007, the Ast. Mgr. CL position became vacant. NVI did not at that time post job vacancies or formally inform its employees that a position had become open.  Employees, being human, would, however, learn about openings.  NVI's policy of promoting from within allowed an interested employee to inform the store manager of his or her interest in an open position, alleviating the need to fill out a formal job application each time a vacancy occurred.  Edwards contends that, in late spring 2007, she approached L. Moore and expressed an interest in the open Ast. Mgr. CL position.  Edwards says that L. Moore told her that the position was not going to be filled.  Nevertheless, the position was later filled by Angela Ratliff ("Ratliff"), a white female.  There is no

17

evidence that Edwards voiced a complaint about being overlooked on this occasion, unless her confused reference to a 2007 conversation with L. Moore, now straightened out, is considered a complaint. Ratliff remained in the position until December 2007.  Nasharee Flournoy ("Flournoy"), a black female, was hired for the position in February 2008, again without protest by Edwards.

In January 2008, following a district realignment, Tina Wicker ("Wicker") became the district manager responsible for the Alabama market, including NVI's Homewood store.   Wicker thereafter conducted a first quarter audit of the store.  The audit revealed that the store was not being properly managed under L. Moore. Wicker discovered that there were numerous performance problems, including problems with housekeeping, accounts receivables, and customer service.   There was also a problem with employees not meeting NVI's dress code.  L. Moore admitted to Wicker that she was having trouble getting employees to listen to her and to follow store procedures.

NVI contends that Edwards's performance at the time was lackluster, consistent with the overall lackluster performance of the store.  In 2007, Edwards was given a performance improvement plan after engaging in "a profanity-laden shouting match" with a customer.  In her first performance appraisal, dated January 15, 2008, Edwards received an overall three out of five for "meets expectations," but received a substandard score of two out of five

18

in the categories "behavioral assessment" and  "job knowledge."
Nevertheless, at the end of the evaluation, Edwards was given a
raise from $8.50 to $8.80 per hour.

After the audit, Wicker admonished L. Moore to hold associates
accountable and to discipline them when they failed to follow NVI
polices and procedures.   Thereafter, L. Moore began to hold
associates, including Edwards, more accountable.  In doing so, she
apparently got on associates' nerves.

In April 2008, shortly after L. Moore began more carefully to
scrutinize employee performance, an employee lodged a complaint
regarding the management of the Homewood store by placing an
anonymous call to NVI's In-Touch hotline.   The caller did not
allege racial or any other form of illegal conduct.  Instead, the
caller complained about L. Moore's management and about Flournoy,
the Ast. Mgr. CL.   Among other complaints, the anonymous caller
said:

> I'm calling about Louise Moore . . . and it's [Nasharee
> Flournoy], I think.  She's one of the new contact lens
> managers.  We . . . it's several of employees that if you
> all just come in and ask questions will tell.  We've just
> been having a lot of problems since she's been there.
> And notice that you all have a bad turnover.  I've been
> there it'll be a year and you have lost 15 people.  It's
> the way they treat you, the way they talk to you.  They
> get an attitude when they ask you questions.  And then
> you voice your opinion and then you retaliate and start
> writing to do this and do that and moving chairs out the
> front.  It's just a lot of things that you need to check
> out the company . . . .

Edwards's present contentions regarding L. Moore are consistent

with this anonymous caller's complaints, which can only be described as generalized criticisms of management. Also consistent, Edwards claims that L. Moore treated all the employees poorly and that "[e]verybody that worked there" had problems with her. According to Edwards, multiple employees left the Homewood store because of L. Moore's management style during Edwards's first year with NVI, and numerous employees repeatedly complained about L. Moore. None of these criticisms involved the race of L. Moore, the races of any of her critics, or the races of any of the employees who quit.

In May 2008, less than a month after the anonymous hotline call, Flournoy walked off the job, leaving the Ast. Mgr. CL position open again. As before, Edwards says that she inquired about the position, and L. Moore again told her that no one would be hired to fill it. In June 2008, upon L. Moore's recommendation, Wicker hired Victoria Alberson ("Alberson"), a white female, for the position. Edwards claims that Wicker was aware that Alberson was white at the time of the hire, but offers as proof only the fact that all applications to NVI for employment include the race of the applicant. Wicker denies having known Alberson's race. NVI and Wicker assert that Alberson was selected because of her experience in retail management at a Sam's Club store. After being hired, Alberson worked at the Homewood store until October 2010. Two other assistant managers at the Homewood store during Edwards's

20

tenure, Kimberly Wadsworth and Latasha Huey, were black.

Shortly after Alberson was hired, Edwards requested a medical leave of absence to have elective surgery.  L. Moore approved Edwards's request.  Edwards's leave commenced on July 21, 2008.[8] The parties dispute whether Edwards was actually eligible for FMLA leave.  NVI contends that Edwards was not FMLA eligible, but that it nevertheless granted her request for time off.  Edwards contends that she was eligible for leave under the FMLA and points to a document prepared by Michelle Williams ("Williams"), NVI's benefits specialist, entitled "Request for Leave of Absence."  On the document, someone, presumably Williams, marked that it had been determined that Edwards was "eligible" for leave under the FMLA and that the requested leave would be counted against her annual FMLA leave entitlement.

In late July 2008, Wicker and the area manager, Andre Campbell ("Campbell"), a  black male, visited the Homewood store.  As part of their visit, Wicker and Campbell assessed employee morale in relation to the aforementioned In-Touch hotline call.  Wicker scheduled this visit while L. Moore would be on vacation so that employees would feel comfortable discussing the store management. They spoke with all the employees at the Homewood store except L. Moore and Edwards, who was on medical leave.  During the audit, one

---

[8] Edwards was released to return to work on August 25, 2008. She returned to work on or about August 26, 2008.

21

of the optometrists, Dr. Arello, reported that Edwards was "disgruntled," "not a happy person," and "in anger management classes." Wicker nevertheless reported to NVI that employee morale was good and that no one complained about the management. Other than a few equipment issues, Wicker concluded that the store was running well and noted that this was an improvement over what was reflected in her first quarter audit.

In August 2008, when Edwards returned to work after her short medical leave, Alberson was in place as the new assistant manager for contact lenses. Upset about being passed over for the promotion, Edwards confronted L. Moore about it on August 30, 2008, at a staff meeting. According to Edwards, L. Moore refused to discuss the matter with her because others were present. It was at this meeting that L. Moore is supposed to have uttered the hearsay here under consideration. The presence of others, means that Edwards was not the only person who heard what L. Moore supposedly said. There is no testimony offered from any listener except Edwards. Where is the testimony of the other persons who heard it?

According to NVI, Edwards continued to have performance issues. L. Moore and Alberson noted performance deficiencies by Edwards on several occasions, including on "customer relations" and "general attitude." On September 5, 2008, Edwards was placed on a performance improvement plan after an incident on August 30, (the same day of L. Moore's hearsay statement) in which NVI's records

indicate that she failed to follow store procedures in the scheduling of patients.  On the other hand, L. Moore and Alberson gave Edwards positive feedback when she met expectations.

On September 3, 2008, shortly after she was placed on the performance improvement plan, Edwards faxed a complaint to Keisha Moore ("K. Moore"), an employee relations representative in NVI's human resources department.  K. Moore is a black female.  In her fax, Edwards said:

> I Aretha Edward [sic] wanted to report racism, reason being I request job position requirement from Ms. Louise Moore she stated that she wasn't hiring for position but she would keep in mind that I inquire for position but instead she hire Ms. Victoria [Alberson] for position who is white because of more experience.  But upon talking to Ms. [Alberson] she stated that she havent work as a manager or in that particular position that she was hire for.  This wasn't the 1st time that she hired a non-experienced white female for the position.

On September 17, 2008, Edwards followed up with a call to K. Moore after which K. Moore launched an investigation into Edwards's complaints and asked Edwards to provide her a written statement. Edwards provided K. Moore such a statement on September 19, 2008. In the statement Edwards made no mention of racial discrimination. Instead, she alleged that "several employees [had] been harassed for unknown reasons," that "unqualified people [had] been hired for manager position," and that "qualified people in the management office [had] been looked over for management position or advancement."  K. Moore contacted Edwards to get additional information.  K. Moore made notes about Edwards's complaint,

including that Edwards wanted a position as an Ast. Mgr. CL and
that L. Moore had told her they weren't hiring within the store and
that they were "not [hiring a] black empl[oyee]." This was
necessarily a reference to the August 30 conversation that NVI says
should be stricken, the only conversation between Edwards and L.
Moore in which L. Moore said that "they" wanted a "white token."

K. Moore's investigation included interviews with multiple
employees at the Homewood store. On October 28, 2008, K. Moore
had another follow-up phone conversation with Edwards. During this
call, Edwards says she told K. Moore that L. Moore had told her
that a black person would not be hired for the Ast. Mgr. CL
position. If this was a reference to an occasion other than the
August 30 conversation, Edwards did not make it clear. Based on
this allegation, K. Moore interviewed employees whom Edwards said
could corroborate her allegations. All employees that K. Moore
interviewed denied ever hearing L. Moore say that she was not going
to hire a black person or that she was only going to hire a white
person. One employee, Krystal Wilson, did tell K. Moore that she
once heard L. Moore say that she wanted to get a "mixture of
people." Neither Title VII nor § 1981 stands in the way of
diversity as a hiring objective, although implementing such an
"ideal" is problematic and is fast becoming dangerous.

After her investigation, K. Moore concluded that there had
been no discriminatory or harassing treatment of employees by L.

24

Moore, or by any other manager at the Homewood store.  Except for what Edwards said, she uncovered no evidence of racially discriminatory remarks and no employment decisions that had been made in an inappropriate or discriminatory manner.  There is no suggestion that L. Moore admitted to K. Moore or anyone else that she had ever said what Edwards ascribes to her.  As a result of K. Moore's report, NVI concluded that the store, while not having engaged in discriminatory conduct, was being poorly managed.  NVI thereafter provided managerial coaching and training to both L. Moore and to Alberson and eventually put L. Moore on an improvement plan.

On November 26, 2008, Edwards filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation on the part of L. Moore.  Edwards's internal complaints prior to November 26, 2008 had primarily focused on L. Moore's poor management style, but they did contain references to statements by L. Moore to the effect that Edwards would not be promoted because she was not white.

The problems between Edwards and L. Moore continued.  On January 15, 2009, L. Moore again put Edwards on a performance improvement plan for repeated violations of NVI's attendance policy and for insubordination.  Edwards objected, contending that she had not violated the attendance policy.  Edwards says that L. Moore assigned her additional and demeaning work, such as cleaning

baseboards, and told other employees not to talk to her.  In early 2009, Edwards received her annual performance evaluation. Edwards's scores were significantly lower than they had been the previous year.  Nevertheless, she received a pay increase to $9.02 per hour.  Edwards did not amend her EEOC complaint to add any allegedly retaliatory acts that occurred after the EEOC complaint was filed.  However, the EEOC investigation did apparently cover all of NVI's alleged misconduct, including what it described as Edwards's "discharge."

During the pendency of Edwards's EEOC charge, the overall performance of the Homewood store continued to deteriorate.  As a result, NVI asked Jill Barber ("Barber"), an area manager, to visit the store and to coach L. Moore.  Barber is a black female.  During her visit, Barber observed significant problems.  In February 2009, L. Moore herself was placed on a performance improvement plan, just as Edwards had been on two occasions earlier.  Because L. Moore's performance did not improve, NVI terminated her on June 4, 2009, while Edwards was still an employee.  Edwards's reaction to L. Moore's termination is not reflected in the record.

In July 2009, Edwards submitted a request to become a part-time employee so that she could go to school.  After NVI honored her request and put her on a part-time schedule, she applied for unemployment benefits.  The Alabama Department of Industrial Relations denied her claim.  She appealed the decision to the

Circuit Court of Jefferson County, Alabama, which held that because she voluntarily decided to move to part-time, she was not entitled to unemployment compensation.

During the summer of 2009, Edwards was scheduled to undergo another elective surgery. She submitted an FMLA leave request to John Anderson ("Anderson"), who was by that time the general manager of the Homewood store. Anderson asked Edwards if she could delay the surgery for a few weeks because NVI did not have anyone else to perform visual field tests. Edwards agreed, and rescheduled her surgery for March 2010. In October 2009, after Edwards submitted her second FMLA request, her hours were significantly reduced. From late November 2009 until the end of her employment, Edwards only worked one day a week, averaging less than eight hours a week. Whether the EEOC investigated this decrease in Edwards's hours or days as possible retaliatory conduct does not appear in the record.

Edwards's last day working for NVI was in February 2010. Edwards says that she received a call from Williams of NVI's human resources department, during which Williams asked her if she had started a rumor about Anderson having an inappropriate relationship with an employee, Askieka Nealey ("Nealey"). Edwards denied having said any such thing. At Williams's request, Edwards prepared a written statement to that effect. According to Edwards, that same day, Nealey, the woman she had allegedly accused of having engaged

27

in inappropriate conduct, told her to leave work and that NVI would be in touch with her. Edwards left work without questioning Nealey's authority. Edwards asserts that the next day she received a call from another employee, "Tasha," who told her not to come back to work until further notice. What authority, if any, either Nealey or "Tasha" had to tell Edwards not to come to work is not reflected in the record. While no one called Edwards asking her to return to work, Edwards never contacted Anderson, the general manager of the store and the final decisionmaker on personnel matters to check on what was expected of her.

Edwards remained on the work schedule. She failed to show up for her scheduled shifts on March 1, March 8, and March 15. She did not call or speak with anyone in management before any of her said three absences. Accordingly, on March 16, after the third unexcused absence, Anderson notified the human resources department that Edward had voluntarily terminated her employment through "no call, no show" for three consecutive shifts, and she was removed from the NVI employment rolls.

### The Viability of the Several Separate Claims

### I.   Race Discrimination

#### A. Failure to Promote

Edwards's primary contention is that NVI passed over her for a promotion to the Ast. Mgr. CL position because she is black. Specifically, Edwards alleges that she was discriminated against

28

when she was not promoted (1) in July 2007 (Ratliff hired, white); (2) in February 2008, (Flournoy hired, black); and (3) in June 2008 (Alberson hired, white).

Edwards's Title VII claims regarding the Ratliff and Flournoy hirings are time-barred.  Edwards concedes that the Ratliff and Flournoy hirings occurred more than 180 days before she filed her charge of discrimination with the EEOC and, therefore, cannot be challenged under Title VII.  Edwards's claim relating to the June 2008 hiring of Alberson is the only Title VII claim that is not time-barred.

All three of Edwards's § 1981 failure to promote claims are subject to a two year statute of limitation period and barred. Section 1981 does not contain a statute of limitations.  Instead, in 1987, the Supreme Court directed federal courts to determine the statute of limitations for § 1981 claims by applying the most analogous state statute of limitations, which in Alabama is two years.  *See Goodman v. Luken Steel Co.*, 482 U.S. 656, 661, 107 S. Ct. 2617, 2621 (1987).

Edwards argues that her § 1981 claims are not time-barred because of a "catch-all" four year statute of limitations.  In 1990, Congress enacted a general four year statute of limitations applicable to federal statutes **enacted after December 1, 1990,** except as otherwise provided by law.  28 U.S.C. § 1658.  The next year, in 1991, Congress enacted Section 101(2)(b) of the Civil

Rights Act of 1991, which altered § 1981.  The statutory "catch-all" four year statute of limitation is only applicable to new causes of action that were not cognizable under § 1981 prior to the enactment of § 1658.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 381, 124 S. Ct. 1836, 1845 (2004).  Otherwise, the two year statute of limitations period still applies.  The four year statute of limitations does not apply to Edwards's failure to promote claim because such a claim was cognizable under § 1981 prior to the 1991 amendment, making them subject to the two-year limitations period.  *Summerlin v. M&H Valve Co.*, No. 03-AR-2786-M, 2005 WL 6132650, at *4 (N.D. Ala. Jan. 31, 2005).

Before the enactment of the 1991 Civil Rights Act, a failure to promote claim could be brought under § 1981 if the promotion rose to the level of an "opportunity for a new and distinct relation between the employee and the employer."  *Patterson v. McLean Credit Union*, 491 U.S. 164, 185, 109 S. Ct. 2363, 2377 (1989).  Edwards's desired promotion to Ast. Mgr. CL clearly met this standard.  There is no bright line rule as to what promotions create a "new and distinct relationship."  Courts, however, have recognized that promotion decisions cognizable under the pre-1991 statute include "promotions from non-supervisory to supervisory positions and advancements from being paid by the hour to being a salaried employee."  *Smith v. Train U.S., Inc.*, No. 6:11-cv-3, 2011 WL 4944143, at *4 (S.D. Ga. Oct. 17, 2011) (quoting *Cross v. Home*

30

*Depot*, 390 F.3d 1283, 1289 (10th Cir. 2004)).  Similarly, the Eleventh Circuit has held that a plaintiff states a cause of action under pre-1991 § 1981 when she alleges that she was denied a promotion to a position that would have brought her new duties, a new job title, and a significant increase in salary.  *Nunez v. First Union Nat'l Bank of Fla.*, 996 F.2d 287, 289 (11th Cir. 1993). In her complaint Edwards characterizes the Ast. Mgr. CL position as a "manager position" and alleges that the promotion would have afforded her "a higher rate of pay, greater employment benefits, and prestige among her peers."  In her brief, Edwards argues that, without contradiction, if she had been promoted, she would have received a pay increase from an hourly wage to a yearly salary of $26,000 and would have been able to participate in an incentive plan for managers.  Based on her own allegations, the promotion to Ast. Mgr. CL would have afforded her the opportunity for a new distinct relationship with her employer.  *See e.g., Hithon v. Tyson Foods, Inc.*, No. 04-13887, 2005 WL 1820041, at *3 (11th Cir. Aug. 3, 2005); *Summerlin v. M&H Valve Co.*, No. 03-cv-2786, 2005 WL 6132650, at *5 (N.D. Ala. Jan. 25, 2005).  Her failure to promote claims under § 1981 are not dependent on the 1991 expansion of § 1981, so the two-year statute of limitations period applies and bars her § 1981 claims.

Edwards's only promotion claim that is not time-barred is her Title VII claim that she was passed over for the Ast. Mgr. CL

position in June 2008 when Alberson was hired.  With the other timeliness issues resolved in favor of NVI, the court is still faced with the question of whether Edwards has presented evidence to support her claim that NVI promoted Alberson instead of her on account of their differing ethnicities.

To establish a *prima facie* case of race discrimination Edwards must present either "direct evidence" or "circumstantial evidence" of racial animus.  *Collins v. Supreme Beverage Co., Inc.*, No. 11-AR-0058-S, 2012 WL 4953155, *5 (N.D. Ala. Oct. 12, 2012).  "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).  "On the other hand, evidence that only arguably suggests a discriminatory motive, is, by definition, circumstantial evidence.  It requires an application of inference or deduction. It is not self-evident of animus." *Id.* (citing *Burrell v. Bd of Ga. Military Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997)).

Edwards has not presented any admissible direct evidence of a racially discriminatory motive for NVI's failure to promote her. The only thing that could be considered direct evidence of such a motive is the inadmissible hearsay purportedly spoken on August 30, 2008, by the now-deceased L. Moore.  Furthermore, it is undisputed that Wicker, not L. Moore, was the decisionmaker regarding the hiring of Alberson.  Edwards has offered no evidence that Wicker

was influenced by racial animus in making the decision to hire
Alberson. In fact, Edwards herself testified at her deposition that
she does not know whether people who conducted hiring for NVI were
made aware of the races of the people being hired or not hired.
According to Wicker, she did not know whether Alberson was white or
black when she approved her for the position.   Wicker's sworn
testimony in this regard goes unchallenged, except by the fact that
all of NVI's applications for employment include the applicant's
race.  It is a stretch to allow this routine application form as
proof that Wicker is lying.  Unless the stretch is allowed, Edwards
does not come close to proving that race played a part in Wicker's
decision.

The analytical framework for using circumstantial evidence to
support a claim of race discrimination was established in *McDonnell
Douglas Crop. v. Green*.   411 U.S. 792, 93 S. Ct. 1817 (1973).
Under this framework to defeat a motion for summary judgment,
Edwards must demonstrate (1) that she is a member of a protected
class; (2) that she was qualified for and applied for the
promotion; (3) that she was denied the promotion despite her
qualifications; and (4) that an equally qualified or less qualified
person who is not a member of the protected class was selected.
*Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir.
1997) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988),
*cert. denied*, 490 U.S. 1006, 109 S. Ct. 1641 (1989)); *see Summerlin*

*v. M&H Valve Co.*, No. 03-cv-2786, 2005 WL 6132650, at *5 (N.D. Ala. Jan. 31, 2005). Edwards has not presented any evidence of the essential element that NVI hired an "equally or less qualified person" over her. NVI does not argue that Wicker, the decisionmaker, selected Alberson for the position over Edwards after comparing their respective qualifications. Rather, the only evidence is that Wicker approved Alberson for the position after finding her qualified. There is no evidence whatsoever that Wicker was aware that Edwards had applied for, or had otherwise expressed interest in, the Ast. Mgr. CL position.[9]

---

[9] Throughout her brief, Edwards attempts to shift focus away from Wicker, the ultimate decisionmaker, and onto the motivation of L. Moore, her immediate supervisor. Although Edwards does not use the term "cat's paw," she appears to advance this theory, arguing that L. Moore, a black person, was motivated by racial animus against blacks or in favor of whites to recommend Alberson, and not Edwards, for the Ast. Mgr. CL position. The cat's paw theory of liability, or "subordinate bias theory," seeks to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. *Staub v. Proctor Hosp.*, – U.S. –, 131 S. Ct. 1186, 1190, (2011). Under this theory, Edwards must show that L. Moore acted with a discriminatory animus and intended the adverse action, i.e., Edwards not being promoted. *Staub*, 131 S. Ct. At 1194. Additionally, Edwards must show that L. Moore's actions were the proximate cause of the ultimate employment action. *Id.* Edwards cannot succeed under the cat's paw theory of liability. Throughout this litigation, Edwards has never argued that L. Moore acted out of her own racial animus, but instead on behalf of some unidentified "they." Thus, Edwards has urged that L. Moore was a "cat's paw" for some other unspecified persons' discriminatory animus, not the other way around. To now reverse this theory to avoid summary judgment is simply not supported by the record. It is undisputed that L. Moore hired Edwards only a year before, recommended Flournoy, who is also black, for the exact same position only months earlier, and that most of the employees, including several in management positions, were black.

This does not mean that Alberson's and Edwards's relative qualifications for the job are totally irrelevant.   A plaintiff must demonstrate as part of her *prima facie* case that an "equally or less qualified employee who was not a member of the protected group was promoted." *Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).   Using objective criteria, a comparison of Alberson's and Edwards's relative qualifications arguably demonstrates that Alberson was more qualified than Edwards despite Edwards's longevity at NVI without management experience. Alberson had retail management experience, including three years of management at a Sam's Club store, which is owned by NVI's partner, Wal-Mart.   On the other hand, Edwards had no retail management experience, unless working as an assistant manager and cashier at a gas station more than five years before her employment with NVI is considered such.   Edwards does not deny that before the Alberson hiring NVI had disciplined her and had placed her on performance improvement plans, hardly indications of a belief by NVI in her managerial ability.   There is no evidence from which a reasonable jury could find that Alberson less qualified than Edwards or only equally qualified for the Ast. Mgr. CL position.   NVI's decisionmakers were obviously underwhelmed by Edwards's qualifications for a managerial role.   They certainly had no reason to think Alberson was less qualified than Edwards.

To prove that Wicker knew Alberson's race, despite Wicker's sworn denial of such knowledge, Edwards must depend upon inference from the application form and thus on circumstantial evidence. The court cannot allow a jury to draw such an inference in this case.

Even if Edwards could meet her burden of establishing a *prima facie* case of racial discrimination using circumstantial evidence, she cannot show the pretext necessary to defeat summary judgment. After a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its adverse employment decision. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). NVI has met this "exceedingly light" burden. *See Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). NVI says that Wicker approved Alberson for the position because she considered her a good candidate based on her experience and because she was not aware that Edwards was interested in the position. These are clearly legitimate, non-discriminatory reasons for the decision Wicker made. When an employer, as NVI has done in this case, articulates a legitimate, nondiscriminatory reason for its action, any presumption of discrimination that may have arisen from the plaintiff's *prima facie* case "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749 (1993). Edwards must demonstrate that NVI's articulated reason is a mere cover for statutorily proscribed acts of

discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

Pretext means a lie, or, in this context, a phony reason. *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001). A mistake does not constitute a pretext. *Id.* NVI contends that Wicker approved Alberson for the Ast. Mgr. CL position because she believed that Alberson was qualified and was not aware that Edwards had an interest in the position, leaving no reason for Wicker to compare qualifications. There is no evidence from which a reasonable jury could find this explanation to be a pretext. Even if it could somehow be assumed that Wicker knew that Edwards was interested in the position, there is absolutely no evidence that the hiring of Alberson was a pretext for racial discrimination against Edwards. If Edwards expressed an interest in the position to L. Moore, that fact is immaterial.[10] There is no evidence that Wicker was ever made aware of Edwards's interest. Wicker's testimony that she was not aware of Edwards's interest is the only evidence on the subject.

Edwards attempts to show pretext by pointing to what she calls NVI's "shifting positions" and "mendacity" found in NVI's position statement during the EEOC investigation and its interrogatory responses. Both of these arguments are unpersuasive. Edwards's

_____

[10] NVI assumes that Edwards discussion with L. Moore the Ast. Mgr. CL position for purposes of Rule 56 consideration only.

"shifting positions" argument fails because NVI has consistently maintained that Wicker, the decisionmaker on the Alberson hiring, did not consider selecting Edwards for the position because she was unaware that Edwards was interested.  NVI has also consistently denied that Edwards applied for the position filled by Alberson, despite what Edwards says about her conversation with the now deceased L. Moore.  This is not the type of "shifting of positions" that could support a finding of pretext.  Edwards's accusation that NVI made misrepresentations in defending her EEOC charge is both incorrect and immaterial.  What Edwards refers to as a "misrepresentation" is nothing more than a disagreement over what are the pertinent facts.  If such an argument can form the basis for a finding of pretext, every plaintiff could show pretext by the expedient of disagreeing with the defendant's version of the facts. Furthermore, even if NVI's versions of certain disputed facts are demonstrably incorrect, isolated errors in submissions do not prove pretext.  *See e.g., Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 820-21 (E.D. Pa. 2009); *Deal v. Grubb*, 08-cv-575, 2010 WL 3418208, at *8-9 (W.D. Va. Aug. 3, 2010).  NVI is entitled to summary judgment on Edwards' Title VII claim for discriminatory failure to promote.

### B. Discharge

It is unclear from the record whether Edwards really means to pursue a discrimination claim based on her purported discharge,

i.e., that she was fired because she is black.   What is clear, however, is that she has not advanced any arguments in support of such a claim.   Although not necessary to her exhaustion obligation, she never amended her EEOC charge to complain about a discharge, and the EEOC investigation file is not in the record.   It is not the duty of the court to uncover and discuss every potential argument that can be made.  *Resolution Trust Corp. V. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).   Instead, "the onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* If Edwards ever intended to mount a discriminatory discharge claim, she has abandoned it, rendering it unnecessary for the court to discuss whether Edwards abandoned her job or was fired.   Whether Edwards's departure from NVI was voluntary, as indicated by NVI's records, or was a racially motivated adverse employment action proscribed by Title VII is a question that cannot be resolved without evidence.

## II.  Retaliation

To establish a *prima facie* case of retaliation under Title VII or § 1981, Edwards must show (1) that she engaged in a statutorily protected activity; (2) that NVI subjected her to some materially adverse employment action; and (3) that there is a causal relation between her protected activity and the adverse action.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

39

NVI does not deny that Edwards engaged in statutorily protected activity.  Instead, NVI argues that its actions that Edwards complains of, to the extent not precluded by some statute of limitations, were not "materially adverse" and, even if they were materially adverse, that she cannot show the requisite "causal connection" between her protected activity and any of the allegedly adverse actions.

Edwards does not make it clear whether her claim of retaliation includes her ambiguous claim of wrongful discharge. Her EEOC charge can fairly be construed as having a retaliation aspect, although not retaliation in the form of a wrongful discharge.  Her departure did not occur until long after she filed her EEOC complaint.  She has never claimed constructive discharge or a discharge formally rendered by someone at NVI with authority to fire her.  Edwards does not address any of NVI's arguments in support of its Rule 56 motion as addressed to her retaliation claim.  There is no evidence that Anderson knew of Edwards's EEOC complaint or any other complaint by Edwards when he entered the "no call no show" voluntary termination for her.  Her protected activities took place in September and November 2008, nearly a year before Anderson was hired.  There is no evidence whatsoever that Anderson's reason for removing Edwards from the employment rolls, i.e., his belief that she had abandoned her job, was a pretext to cover a retaliatory motive.

40

Taken singularly or in the aggregate, the complained of acts of NVI do not provide the essential elements of a *prima facie* case of retaliation.   To satisfy the adverse employment action requirement, Edwards must show that "a reasonable employee would have found the challenged action **materially** adverse." *Burlington N. & Santa Fe. Ry. Co.*, 548 U.S. at 68, 126 S. Ct. at 2415 (emphasis added).  An action is said to be "materially adverse" if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*  Edwards points to several NVI actions which she insists were acts of retaliation. These include:

> - On September 5, 2008, L. Moore put Edwards on an employee improvement plan;
>
> - L. Moore instructed Alberson to "write-up" Edwards;
>
> - On January 9, 2009, L. Moore put Edwards on another performance improvement plan, which was subsequently reversed;
>
> - On February 24, 2009, L. Moore and Wicker issued Edwards a less than perfect performance evaluation that nevertheless did not prevent a pay increase; and
>
> - L. Moore required Edwards to see "more than double" the number of patients than her co-workers were required to see, required her to clean baseboards, and instructed co-workers "not to talk with [her] or associate with her."

These acts are not sufficiently onerous to support a claim of retaliation.  NVI reasonably relies on *Burlington Northern & Santa Fe Ry. Co. v. White*, in which the Supreme Court cautions courts to "separate significant from trivial harms" and emphasizes that "[a]n employee's decision to report discriminatory behavior cannot

41

immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006).  The actions about which Edwards complains are of the type that the Supreme Court has instructed lower courts to weed out.  Reprimands and lowered performance evaluations are not "materially adverse," particularly when one of Edwards's reprimands was reversed and her performance evaluation resulted in a raise.  *See e.g., Forbes v. City of North Miami*, No. 11-cv-21200, 2012 WL 1135820, at *11-12 (S.D. Fla. Apr. 4, 2012); *Blackledge v. Ala. Dept. Of Health & Mental Retardation*, No. 06-cv-321, 2007 WL 3124452, at *30 (M.D. Ala. Oct. 25, 2007).  Being asked to perform additional work is not a materially adverse employment action, especially when, as Edwards admits, she had always been required to clean the store.  Title VII does not anoint the courts with the power to decide that routine management decisions, even if resented by an employee, are so awful that they are actionable as retaliation.

If Edwards, *arguendo*, has met her burden of showing some materially adverse action or actions, she must show a causal connection between her protected activity, here conceded by NVI, and an adverse employment action.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).  Causation may be inferred from close temporal proximity between the protected

expression or opposition and the adverse employment action.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). When a significant amount of time has elapsed between the protected activity and the adverse action, a causal connection can exist if and only if the protected activity and the adverse action are linked by a chain of intervening retaliatory acts.  *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).  When causation is based solely on temporal proximity, the two events must be "very close" to establish the requisite causal connection. *Cooper Lighting, Inc.*, 506 F.3d at 1364 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508 (2001)).  Edwards places great store on the fact that she was put on a performance improvement plan on September 5, 2008, two days after she says she voiced a complaint to K. Moore.  It is undisputed that the improvement plan was imposed upon Edwards on the heels of incidents that occurred on August 30 or shortly thereafter.  Even if there was a relationship between these closely proximate incidents and Edwards's being placed on an improvement plan, this NVI action was not a materially adverse employment action.  It seems more likely to have been an effort to help Edwards than to punish her.  Edwards does not argue and cannot argue that she never needed to improve her performance.  It is undisputed that this was not the first time L. Moore had placed Edwards on an improvement plan.  There is no proof that Edwards was singled out for being placed on an

improvement plan.  L. Moore herself was put on an improvement plan and was subsequently discharged for not improving.

The April 2008 anonymous hotline call demonstrates that many employees had difficulties working with L. Moore.  According to Edwards, L. Moore treated all subordinates badly and "[e]verybody that worked there" had problems with her.  Edwards has presented no evidence that any of the alleged adverse employment actions, whether material or not, were causally related to protected activity.  The court cannot speculate, or let a jury speculate, in order to find the existence of such essential elements in a Title VII case.

Assuming *arguendo* that Edwards has established a *prima facie* case, NVI nevertheless is entitled to summary judgment on Edwards's retaliation claim because Edwards has offered no evidence that NVI's articulated reasons for any of its employment actions, whether innocuous or material, were a pretext to cover retaliation. In fact, Edwards does not even address pretext in her brief.

On April 24, 2013, the Supreme Court heard oral argument in *University of Texas Southwestern Medical Center v. Nassar*, in which the petitioner argued that for a Title VII retaliation claim to be viable, the retaliatory motive must be the "but for" cause of the adverse employment action.  From a quick look at the oral argument, it seems that the Supreme Court is divided on whether to apply to retaliation claims the same reasoning it applied to ADEA claims in

44

*Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343 (2009). Edwards does not allege or argue that NVI's alleged adverse employment actions would not have occurred **but for** its retaliatory motive. This court will not speculate as to what the Supreme Court will hold in *Nassar*, or what effect its holding will have on Edwards's claim of retaliation. If the petitioner wins in the Supreme Court, Edwards cannot proceed on a theory of retaliation while continuing to pursue her current mixed-motive claim. The court will not wait for the Supreme Court.

For the foregoing reasons, NVI is entitled to summary judgment on Edwards's retaliation claim.

### III. Racial Harassment

Edwards has failed to present any evidence of racial harassment, particularly not any possibly harassing conduct by NVI that is not time barred. She concedes that she never heard anyone in management use racist language. Instead, at her deposition she premised her harassment claims on several race-neutral actions taken by L. Moore, including standing behind her while she was on the phone, making her take break time differently from everyone else, telling other employees not to talk to her, and preventing her from answering phone calls. These actions bear the mark of poor management skills. They do not bear the mark of racism, especially when they involve a black supervisor with whom the subordinate obviously does not get along. There are a lot of

obnoxious supervisors who may or may not be Title VII Simon Legrees. Edwards necessarily is reduced to premising her harassment claim on her recollection of her conversation of August 30, 2008, with L. Moore, the conversation that has been stricken as hearsay. Edwards wants this court not only to find a racial motive for her being passed over for a promotion, but that her allegation of racial motive is proof that the treatment that bothered her (and other employees) was racial harassment.

NVI is entitled to summary judgment on Edwards's racial harassment claims.

### IV. FMLA

Edwards claims interference and retaliation in violation of the Family and Medical Leave Act ("FMLA") related to her 2009 leave request.[11] To bring a claim under the FMLA, Edwards must first be an "eligible employee." The FMLA defines "eligible employee" as an employee who has worked at least 1,250 hours during the preceding twelve-month period. 29 U.S.C. § 2611(2)(A). Even if the employee has worked 1,250 hours an employer has no FMLA obligation if it employs less than fifty employees within a seventy-five mile radius of the employee's worksite. *Id.* at § 2611 (2)(B)(ii).

It is undisputed that at the time Edwards quit or was

---

[11] To the extent that Edwards made any claims based on her 2008 FMLA leave, those claims were not addressed in her brief and are deemed abandoned.

terminated,[12] she had worked only 790 hours in the preceding twelve months.  This fact alone precludes her from FMLA eligibility.[13] Edwards argues, however, that this case is an exception because, after she submitted her FMLA request to Anderson, he "interfered" with her right to take leave.  Specifically, Edwards argues that after she requested FMLA leave in late summer/early fall 2009, Anderson asked if she would defer her leave because she was needed at work.[14]  She contends that he then began purposefully and systematically to reduce her hours to a point where, by November

---

[12] Because Edwards never took her requested FMLA leave in 2009, the date of her termination is the most relevant date for the purposes of calculating hours.

[13] The parties dispute whether NVI employed less than fifty employees within a seventy-five mile radius of the Homewood store.  NVI has offered Wicker's declaration that, during the time that Edwards was employed by NVI, the total number of employees within seventy-five miles was less than fifty.  In response, Edwards has provided documentation that when she applied for FMLA leave in 2008, NVI granted her leave and confirmed in writing that she was eligible for leave under the FMLA.  She argues that this evidence is sufficient to create a jury issue as to whether there were greater than fifty employees within seventy-five miles of the Homewood store.

Although NVI denies that it employed more than fifty people within seventh-five miles of the Homewood store, at least at some relevant point in time, NVI represented to Edwards that it was a covered employer by issuing the coverage letter to Edwards.  The conflicting evidence before the court, the Wicker declaration and the coverage letter, create a disputed issue of fact as to whether NVI employed enough individuals to be a covered employer under FMLA.  This issue is not dispositive of the FMLA claim.

[14] When leave is foreseeable due to planned medical treatment, as it was here, an employer may ask an employee to postpone or delay her procedure without interfering with her FMLA rights.  *See Franks v. Indian Rivers Mental Health Ctr.*, No. 7:08-cv-1035, 2012 WL 4736444, at *15 (N.D. Ala. Sept. 30, 2012).

2009, she was only working one day a week.   Edwards argues that these actions violated FMLA by interfering with her right to take FMLA leave.

Edwards offers no evidence to support her allegation that Anderson, with Machiavellian intent, reduced her hours in order to make her ineligible for FMLA leave.   Furthermore, her allegation in this regard cannot be reconciled with her deposition testimony. When asked the basis for her FMLA claim, Edwards testified that Anderson had only delayed her requested leave in 2009 for a short period and that she had agreed to it.   When asked if Anderson had done anything other than delay her leave to interfere with or oppose her FMLA leave, Edwards answered "[n]othing else."   Edwards admits in her brief that she requested that her hours be reduced and that she become a part-time employee in July 2009 so that she could go to school.   She explained, also, that around this time, NVI was remodeling, so she was already working on and off three days a week.   It was not until months after her FMLA request, in October 2009, that Edwards's schedule was reduced to one day a week.

Edwards has offered only hopeful conjecture to support her theory that NVI reduced her hours so that she would be ineligible for FMLA. She has offered nothing but speculation to provide a causal connection between her reduced hours and her 2009 FMLA leave request.   Speculation and conjecture are not enough.   Without

48

evidence, Edwards has presented the court with nothing but "arguments of counsel." The undisputed evidence shows that Edwards worked 790 hours during the twelve-month period preceding her termination. Based on this single undisputed fact, Edwards was not eligible for FMLA. Accordingly, NVI is entitled to summary judgment on the FMLA claim.

### IV. State Law Claims

#### A. Constructive Discharge

NVI is entitled to summary judgment on Edwards's so-called "constructive discharge" claim because no such claim exists in Alabama. *See Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1398, 1406 (M.D. Ala. 1997) ("There is no Alabama cause of action for constructive discharge, particularly in view of the fact that [plaintiff] was an employee-at-will with no contractual protection."). Even if Alabama recognized such a claim, NVI would be entitled to summary judgment as to it because Edwards does not address such a claim in her brief, abandoning this spurious claim. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

#### B. Invasion of Privacy

Alabama recognizes four distinct torts under the label "invasion of privacy." These wrongs include: "(1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates

49

ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for commercial use." *Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000) (quoting *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997)).  Edwards contends that NVI invaded her privacy by giving publicity to private information about the her that violates ordinary decency and by putting her in a false position in the public eye.  NVI is entitled to summary judgment on both of Edwards's said claims.

Edwards contends that after she was terminated, NVI repeatedly revealed private information about her and falsely claimed that she was terminated because she was a "no call, no show."  Edwards also asserts that her privacy was invaded when someone at NVI spread the rumor that she was attending anger management classes and told people to stay away from her.  None of these facts, if true, support a claim for invasion of privacy.

Both of Edwards's theories of privacy invasion require that defendant gave publicity to private or false information.  *See Johnston*, 706 So. 2d at 703 (quoting the Restatement (Second) of Torts § 652D); *Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993) (quoting Restatement (Second) of Torts § 652E).  In the context of invasion of privacy, "publicity" means "making . . . public, by communicating it to the public at large,

or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ex parte Birmingham News, Inc.*, 778 So. 2d at 818 (quoting Comments to Restatement (Second) of Torts § 652). No one gave "publicity" to the private and allegedly false information upon which Edwards bases her claims. "Ordinary decency" did not require NVI to alter its regular business practices by walking on egg shells.

The alleged comments regarding Edwards being a "no call, no show" were not given publicity or made known to the public at large. Although Edwards asserts that this information was spread to "all individuals who were involved in the processing of any correspondence concerning Edwards, including letters of reference," there is no such evidence in the record. If, Edwards is referring to the internal payroll action form in her personnel file that Anderson signed, indicating that she had voluntarily terminated her employment through "no call, no show" for three consecutive shifts, the memo is far from "communicating to the public at large" or "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Furthermore, such an intra-corporate communication is entitled to privilege under Alabama law. *See Cantrell v. North Ala. River Homes, Inc.*, 628 So. 2d 551, 552-54 (Ala. 1993) (recognizing that intra-corporation communications are protected by privilege in the context of defamation).

The comment within Edwards's personnel file regarding Edwards's participation in anger management classes also fails to meet the publicity requirement. Although not articulated in her brief, presumably Edwards is referring to comments made by Dr. Arello, an optometrist at the Homewood store, to Wicker, which Wicker reported to K. Moore during the investigation of the Homewood store in 2008. There is no evidence that this comment was communicated outside of NVI's managerial employees, and there is certainly no evidence that it was communicated to the "public at large." Furthermore, such a communication made during an internal investigation would be privileged for reasons similar to the internal personnel action form.

NVI is entitled to summary judgment on both of Edwards's invasion of privacy claims.

### C. Negligent/Wanton Hiring, Training, Supervision, and Retention

Edwards's claim for negligent/wanton hiring, training, supervision, and retention fails because she cannot establish an underlying tort on which to base her claim. *See Leahey v. Franklin Collection Serv., Inc.*, 756 F. Supp. 2d 1322, 1328-29 (N.D. Ala. 2010) (citing *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)). In her brief, Edwards asserts that L. Moore was an "ineffective manager" and that Wicker, NVI's district manager, knew it. Whether Wicker had any reason to believe that L. Moore was harassing Edwards and causing her

emotional distress is unknown.  The court agrees with Edwards that NVI thought that L. Moore was an ineffective manager.  It finally fired her.  After Edwards withdrew her claim for intentional infliction of emotional distress, and now that all other state law claims have been dismissed under Rule 56, there is no underlying tort upon which to base a claim for negligent or wanton hiring, training, supervision, and retention, and NVI is entitled to its dismissal.

### Conclusion

During over thirty years on the bench this court has denied a great many more motions for summary judgment than it has granted. This is as it should be.  A trial is the gold standard for civil dispute resolution.  But Rule 56 was adopted for a reason.  When there are no disputes of material fact, there is no reason to empanel a jury.  This is one of those relatively few cases.

For the foregoing reasons, NVI's motion for summary judgment will be granted in its entirety.  A separate order will be entered effectuating this opinion.

DONE this 17th day of May, 2013.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE